UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
(GREEN BAY DIVISION)

---

DANIEL J. RATAJCZAK, JR.,
ANGELA RATAJCZAK,
SCOTT A. RATAJCZAK, and
ELIZABETH RATAJCZAK,                                        Case No.:  1:13-cv-00045

                                    Plaintiffs,

v.

BEAZLEY SOLUTIONS LIMITED,
R-T SPECIALTY, LLC, and
MESIROW FINANCIAL, INC.

                                    Defendants.

---

**SECOND AMENDED COMPLAINT**

---

        Plaintiffs Daniel J. Ratajczak, Jr., Angela Ratajczak, Scott A. Ratajczak and Elizabeth Ratajczak ("Plaintiffs" or "Ratajczaks"), by their attorneys Stephen E. Kravit, Jon E. Fredrickson, and Benjamin R. Prinsen of Kravit, Hovel, & Krawczyk, S.C., for their Second Amended Complaint against the Defendants allege as follows:

**NATURE OF CASE**

        1.    This is an action for breach of contract, bad faith, declaratory judgment on coverage, and declaratory judgment on the legality of a Seller's Warranty and Indemnity Insurance Policy ("the Policy")[1] issued by Defendant Beazley Solutions Limited, acting as appointed representative of Beazley Furlonge Limited, a United Kingdom insurer acting and managing on behalf of Lloyd's

---

[1] Where capitalized terms appear in this Second Amended Complaint that are not otherwise defined in this Complaint, those terms have the meaning stated in the Policy.

syndicates 623 and 2623 ("Beazley"). The Policy was issued to the Equity Interest Holders in Packerland Whey Products, Inc., including, but not limited to, Daniel Ratajczak and Scott Ratajczak ("the Sellers"). A true and correct copy of the Policy is attached to this Complaint as Exhibit A and incorporated herein by reference.

2.      The Policy was issued in order to provide the Sellers with insurance coverage for their warranties and representations made in the Stock Purchase Agreement ("Acquisition Agreement") whereby Sellers sold their interests in Packerland Whey Products, Inc. ("Packerland Whey") to Packerland Whey Intermediary Holding Group, Inc. ("Buyer" or "Packerland Holding").

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiffs Daniel J. Ratajczak, Jr. and Angela Ratajczak are husband and wife, citizens of Wisconsin who reside at N7223 County Road AB, Luxemburg, Wisconsin 54217. Daniel Ratajczak, Jr. signed the Acquisition Agreement as President and an Equity Interest Holder in Packerland Whey.

4.      Plaintiffs Scott A. Ratajczak and Elizabeth Ratajczak are husband and wife, citizens of Wisconsin who reside at E3036 County Rd. A, Kewaunee, Wisconsin 54316. Scott Ratajczak signed the Acquisition Agreement as an Equity Interest Holder in Packerland Whey.

5.      Defendant Beazley is, upon information and belief, a United Kingdom insurer, and a citizen of the United Kingdom with its principal place of business in London, England.

6.     Defendant R-T Specialty, LLC ("RT Specialty") is, upon information and belief, a non-resident insurance intermediary that holds a Wisconsin surplus lines broker license, a Delaware corporation and a citizen of Illinois with its principal place of business located at 200 E. Randolph St., 20th fl., Chicago, Illinois 60601.  Effective November 15, 2013, its corporate offices will be: Prudential Plaza, 180 N. Stetson Ave., Suite 4600, Chicago, Illinois, 60601.

7.     Mesirow Financial, Inc. ("Mesirow") is, upon information and belief, a non-resident insurance intermediary, a Delaware corporation and a citizen of Illinois with its principal place of business is located at 353 N. Clark St., Chicago, Illinois 60654.

8.     Beazley is an unauthorized insurer in Wisconsin, and offers surplus lines coverage in Wisconsin without a certificate of authority from Wisconsin's Commissioner of Insurance.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), because it is between citizens of one state and citizens or subjects of a foreign state, the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between all Plaintiffs and all Defendants.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1392(a) and (b).

## GENERAL ALLEGATIONS

I.     *Sale of Packerland Whey*

11.     On May 15, 2012, Plaintiffs sold their ownership interests in Packerland Whey to Packerland Holding on the terms stated in the Acquisition Agreement of that same date. Plaintiffs Daniel J. Ratajczak, Jr. and Scott A. Ratajczak were the owners of the shares sold pursuant to the Acquisition Agreement; Daniel's wife Angela and Scott's wife Elizabeth also signed the Acquisition Agreement in their capacities as the spouses of the owners of Packerland Whey.

12.     The Acquisition Agreement contains three categories of warranties and representations made by the sellers: (1) General Warranties; (2) Fundamental and Tax Warranties; and (3) a Trade Secret Warranty.

13.     The General Warranties were set out in Articles III and IV of the Acquisition Agreement, and consisted of all warranties but for those designated as fundamental, tax, or trade secret.

14.     The Fundamental and Tax Warranties were also set out in Articles III and IV, and specifically designated as Sections 3.1 (Organization and Qualification), 3.2 (Authorization; Enforceability), 3.3 (Organizational Documents), 3.4 (Capitalization), 3.5 (Options), 3.13 (Taxes), 3.29 (Brokers), 3.38 (Delux Feeds), 4.1 (Authorization; Enforceability), 4.2 (Title to Shares), 4.7 (Brokers) and 4.8 (Thiry Daems) in Section 8.1.

15.     The Trade Secret Warranty was set out in Article III, section 3.17(m).

16.     Article VIII of the Acquisition Agreement governs indemnification liability of the parties.

17. Pursuant to Article VIII, Section 8.8(d), any indemnification payment made under the Agreement must be treated as an adjustment to the Purchase Price.

18. Under Article VIII, Section 8.8(b), damages for breaches of General Warranties are limited to $1,500,000.

19. Under Article VIII, Section 8.9, the indemnification and reimbursement obligations and limitations in Article VIII are the sole and exclusive remedies of the Parties for breaches of the warranties and representations, but the damages limit of Section 8.8(b) does not limit damages for claims of fraud or an injunction request.

## II. *The Beazley Seller's Warranty And Indemnity Insurance Policy*

20. Prior to entering into the Acquisition Agreement, Buyers suggested that Sellers obtain insurance for potential liabilities arising from the sale of Packerland Whey, including but not limited to, liability for breaches of representations and warranties in the Acquisition Agreement.

21. Defendants RT Specialty and Mesirow acted as intermediaries and procured the Policy for Sellers from Beazley.

22. Defendants specifically tailored the Policy to the terms and conditions in the Acquisition Agreement, and represented the Policy as providing coverage for breaches of the General Warranties, Fundamental and Tax Warranties, and Trade Secret Warranty.

23.     Pursuant to Wis. Stat. §618.41(4) and Wis. Admin. Code Ins §6.17(3)(a), prior to issuance of any surplus lines policy in Wisconsin, the surplus lines agent and/or insurer must promptly forward notice to the potential insured, in a form prescribed or approved by the commissioner of insurance that is substantially similar to the Surplus Lines Insurance Proposal Ins 6.17 Appendix 1, that notifies the potential insured that the proposed insurer has not obtained a certificate of authority to do business in Wisconsin and is not regulated in Wisconsin except as provided in Wis. Stat. §618.41.

24.     Defendants and/or their agents or representatives failed to forward to Sellers the Wisconsin required Surplus Lines Insurance Proposal containing the statutorily required warnings regarding Beazley's unauthorized status in Wisconsin.

25.     Defendants' failure to forward a Surplus Lines Insurance Proposal renders the Policy an illegal Policy.

26.     Wis. Stat. §618.44 states that for illegal policies, "If an insurer does not pay a claim or loss payable under the contract, any person who assisted in the procurement of the contract is liable to the insured for the full amount of the claim or loss, if the person knew or should have known the contract was illegal."

27.     RT Specialty and Mesirow assisted in the procurement of the Policy, and Beazley, RT Specialty and Mesirow knew, or should have known, that the Policy was illegal.

28. Pursuant to Wis. Stat. §618.44, Beazley, RT Specialty, and Mesirow are jointly and severally liable to Plaintiffs for the full amount of their claims and losses.

29. On or about May 15, 2012, Beazley issued the Policy, Number W0009312PYBW. (Exhibit A.)

30. The Acquisition Agreement was incorporated into the Policy as Appendix C.

31. The Policy provides $10,000,000 of coverage for breaches of the Insured Warranties, subject to a $1,500,000 self-insured retention.

32. Insured Warranties are defined in the Policy as: "the representations and warranties stated in Items 7.A, 7.B. and 7.C of the Declarations." (Ex. A, p. 5, Clause III.O.)

33. Item 7.A of the Declarations page of the Policy provides coverage for general warranties:

> A. The general warranties set out in Article III and IV of the Acquisition Agreement (other than those identified as fundamental, tax warranties or trade secrets warranties in parts B and C below) to the extent referred to in the Coverage Spreadsheet as "Cover" or "Partial Cover;"

(Ex. A, p. 2, Item 7.A.)

34. Item 7.B of the Declarations page of the Policy provides coverage for fundamental and tax warranties:

> B. the fundamental and tax warranties set out in Articles III and IV, sections 3.1, 3.2, 3.3, 3.4, 3.5, 3.13, 3.29, 3.38, 4.1, 4.2, 4.7 and 4.8 of the

> Acquisition Agreement to the extent referred to in the Coverage Spreadsheet as "Cover" or "Partial Cover;"

(Ex. A, p. 2, Item 7.B.)

35.     Item 7.C. of the Declarations page of the Policy provides coverage for the trade secrets warranty:

> C.     The trade secrets warranty set out in Article III, section 3.17(m) of the Acquisition Agreement to the extent referred to in the Coverage Spreadsheet as "Cover" or "Partial Cover".

(Ex. A, p. 2, Item 7.C.)

36.     The Insuring Clause in the Policy provides the following broad grant of coverage:

> The Underwriters shall indemnify the Insured for, or pay on its behalf, Loss, in excess of the Retention but not in excess of the Limit of Liability, on account of a Breach or Third Party Demand, provided that each such Breach or Third Party Demand is first reported to the Underwriters in accordance with the terms of this Policy.

(Ex. A, p. 4, Clause II.)

37.     "Breach" is defined in the Policy as "any breach of the Insured Warranties." (Ex. A, p. 4, Clause III.D.)

38.     "Loss" is defined in the Policy as:

> Loss means actual damages, including without limitation diminution in value, which the Insured is contractually obligated to pay as the result of a Breach or Third Party Demand and any Defense Costs arising from a Breach or Third Party Demand, in accordance with the Acquisition Agreement; provided that Loss shall not include:

i.      civil fines or penalties (but only to the extent that such fines or penalties are uninsurable by law) or criminal fines or penalties;

ii.     consequential, special or indirect loss or damage, punitive or exemplary damage, or the multiplied portion of multiplied damages (whether based upon an alleged pricing multiple or otherwise), except for such loss or damage awarded against the Insured or Target Group pursuant to a final judgment by a court of competent jurisdiction or arbitrational panel in connection with the resolution of a Third Party Demand; or

iii.    Injunctive, equitable or other non-monetary relief (except for Defense Costs related thereto) and the Underwriters shall not be obligated to seek, pursue or satisfy any non-monetary remedies.

(Ex. A, p. 5, Clause III.Q.)

39.     The Policy Premium, which was paid, was $160,000.

40.     The Policy allows Beazley the option to participate in the negotiation and settlement of any claims of Breach.

41.     The Policy asks the insured to provide Beazley with all claims correspondence, pleadings, and other documents that relate to the claimed breach, but only to the extent reasonably practicable and possible under the circumstances.

42.     The Policy does not require the insured to provide any privileged or protected information or materials "unless and until the privileged or protected status of such information and materials can reasonably be assured."

43.     The Policy bars Beazley from unreasonably withholding, conditioning, or delaying its consent for an insured to settle claims.

44.     The Policy requires the insured to act at all times as if uninsured and to take all reasonable action necessary or reasonably advisable to mitigate any Loss or potential Loss.

45.     If the Insured fails to act as an uninsured in compliance with Clause XII.B., Beazley can be relieved of its obligations under the Policy if it is adversely affected thereby.

### III.     *The Buyers' Threaten Litigation Based Upon Alleged Warranty Breaches*

46.     On or about December 6, 2012, Peter Lehman, the chairman of the board of Packerland Holding, terminated the employment of Angela and Daniel Ratajczak's employment with Packerland Holding, accused them of wrongdoing in connection with the activities of Packerland Whey, and threatened to sue them.

47.     On or about December 13, 2012, Plaintiffs were provided with a draft complaint of potential claims that were going to be filed against them ("Packerland Complaint").

48.     The Packerland Complaint sought an injunction, the imposition of a constructive trust, and rescission of the Acquisition Agreement, or in the alternative, compensatory damages for breach of contract (Count I) and compensatory and punitive damages for: fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), conspiracy to commit fraud (Count IV) and breach of fiduciary duty (Count V).

49.     The Packerland Complaint generally alleged that the books of account and other records of the Company were not maintained in accordance with

sound business practices and accounting practices because they failed to properly account for the use of a certain ingredient in one of the products manufactured by the company, and that said omission changed the profitability and value of the company.

50.     The Packerland Complaint further generally alleged that the Ratajczaks did not properly disclose the ownership interests in the pizza crust business, did not have the requisite corporate power, authority, right to shares, and authority to convey that business, and that there were no outstanding owners or shares of the pizza crust business.

51.     The Packerland Complaint alleged that the Ratajczaks breached various General Warranties and representations in the Acquisition Agreement, including but not limited to: Section 3.11 (Packerland did not have contingent liabilities) Section 3.14 (Packerland was not in breach or default of its material contracts relating to WPC-34); Section 3.16 (the equipment of Packerland was in good working condition and repair and sufficient for the operation of Packerland.); Section 3.19 (no litigation was pending or threatened against Packerland); Section 3.32 (each product sold by Packerland was in conformity with all applicable contractual requirements); and Section 3.39 (full disclosure of all facts or circumstances regarding the business, including ownership of the pizza crust business, and income from the pizza crust business).

52.     While not specifically stated, the allegations also implicated breaches to various Fundamental Warranties, including Section 3.1 (Organization

and Qualification); Section 3.2 (Authorization; Enforceability); Section 3.3 (Organizational Documents); Section 3.4 (Capitalization); Section 3.5 (Options); Section 4.1 (Authorization; Enforceability); and Section 4.2 (Title to Shares).

## IV. *Settlement Of The Claims*

53. After receiving the Packerland Complaint, the Sellers hired legal counsel to investigate and defend the claims, and explore the potential for settlement.

54. The negotiations became more intense on or about the morning of December 24, 2012, when Buyers directly through counsel advised counsel for the Sellers that if there was going to be any settlement, it would have to be completed, signed, and settlement funds transferred, on or before Friday December 28, 2012.

## V. *Beazley's Refusal To Participate In Settlement Negotiations, Refusal to Consent to Settlement, And De Facto Denial of Coverage*

55. Sellers provided written notice of the Packerland Claim on December 24, 2012 ("Notice"), alerted Beazley to the extreme urgency of the situation and the tight settlement year-end deadline. A copy of the Packerland Claim was enclosed with the Notice. Sellers demanded full coverage for the Packerland Claim, and alerting Beazley that they would continue to mitigate any potential damages by acting as an uninsured, as required by Clause XII.B. of the Policy:



56.     For days, Plaintiffs heard nothing from Beazley.

57.     Meanwhile, Plaintiffs continued to urgently work towards a potential resolution within the framework demanded by the Buyers.

58.     After days of silence, at mid-day on December 27th, Beazley finally responded to plaintiffs' urgent December 24th notice by merely sending an email reserving of all of its rights, and demanding all correspondence that related to the settlement talks:

| From: | William Clarke <William.Clarke@beazley.com> |
|---|---|
| Sent: | Thursday, December 27, 2012 12:44 PM |
| To: | Mark M. Leitner |
| Cc: | Helen Doyle |
| Subject: | Equity Holders in Packerland Whey Products / Policy W0009312PYBW |

Mr. Leitner:

On behalf of Beazley Furlonge Ltd. and Beazley Solutions Ltd., I write to acknowledge receipt of your December 24, 2012, letter related to the above captioned insurance policy. Please note that Underwriters reserve all their rights under the policy and applicable law with reference to the matter you brought to our attention.

Although a more formal acknowledgment will be forthcoming, we note that your letter states that settlement discussions have been ongoing at a fast pace. I would like to bring your attention to Section X of the Policy, and particularly Section X.D., which requires that you provide us with certain documentation and correspondence surrounding any settlement talks or Third Party Demand. If you could please forward to me a full set of all correspondence (letters, e-mails, etc.) that relate to the referenced settlement talks I would appreciate it.

Thank you.

William F. Clarke, Jr.
Specialty Lines/Claims - Financial Lines
Political Risk & Contingency Claims

BEAZLEY GROUP
Syndicate 2623/623 at Lloyd's

t:    +1 (646) 943 5919
c:    +1 (646) 701 3400
a:    1270 Avenue of the Americas, New York 10020
e:    william.clarke@beazley.com

59.     Importantly, at this time Beazley did NOT assert its policy right to participate fully in the defense, negotiation, and settlement.  Beazley offered no guidance to plaintiffs on settlement and how to protect their coverage rights despite the impending expiration of the settlement deadline the following day.  Beazley provided no warning that continuing with settlement might result in Beazley denying coverage.  Beazley did not tell Plaintiff to stop negotiating settlement.  Beazley did not demand that plaintiff not enter into settlement without its consent.  Beazley did not even explicitly reserve its right to consent to settlement.

60.     Later the same day, within hours of receiving Beazley's email, Plaintiffs provided the settlement communications.  By this time, the parameters of the potential settlement had been reduced to writing in near final form, and Plaintiffs included a copy of the draft settlement agreement for Beazley's review and consent:

| | |
|---|---|
| From: | Kimberly S. Vitrano |
| Sent: | Thursday, December 27, 2012 5:12 PM |
| To: | 'William.Clarke@beazley.com' |
| Cc: | Mark M. Leitner; Allison A. Schmidt |
| Subject: | RE: Equity Holders in Packerland Whey Products / Policy W0009312PYBW |

There are 53 attachments linked to this e-mail:
http://syfsr.com/?e=8BB233F3-C92F-4C1A-9A03-4C6042A2E9B0

-------------------------------------------------------------------

Dear Mr. Clarke:

In response to your email, Mark Leitner asked me to collect the settlement correspondence exchanged thus
far concerning Dan and Angie Ratajczak. Please click on the link provided to access the files. Without
waiving any of our rights under the policy, we are continuing to look for documents that fall under your
request.

If you have any trouble opening the link please call me at (414) 271-7100, extension 134.

Best regards,
Kim Vitrano

_____

**Kimberly S. Vitrano**
PARALEGAL

KRAVIT • HOVEL &• KRAWCZYK, s.c.
825 N. Jefferson, Milwaukee, WI 53202-3737
**414-271-7100** x134 | fax 414-271-8135
ksv@kravitlaw.com | www.kravitlaw.com

61.     At 2:57 p.m. Friday December 28th, Plaintiffs again advised

Beazley that settlement absolutely had to be consummated by the close of business

on the 28th, and enclosed a new draft of the "nearly final settlement agreement" for

its approval and consent:

From: Stephen Kravit
Sent: Fri 12/28/2012 02:57 PM
Rcvd: Fri 12/28/2012 02:57 PM
To: Kimberly S. Vitrano; William.Clarke@beazley.com
CC: Mark M. Leitner; Allison A. Schmidt
Subject: RE: RE: Equity Holders in Packerland Whey Products / Policy W0009312PYBW

============================================

Mr. Clark. At the insistence of the claimants, we are required to settle today as you have seen
from attachments from yesterday. Attached is the nearly final settlement agreement
(confidential). As part of our requirement to mitigate, my clients have approved this agreement.
The missing term is the amount. The amount that will be paid today in cash is $9,741,222.94 of
your Insureds' personal funds. The matter will be fully settled and the matters insured are
released and indemnified.

Under separate cover, my paralegal is providing the flurry of today's settlement emails before
agreement was reached. I will provide a final agreement when I have signatures and the final
document. All attachments may not come today but should be available by Monday.

Steve Kravit

62.     Notwithstanding all of Plaintiffs' communications, requests, and warnings, Beazley failed to respond with any direction, association, or consent during Wisconsin business hours on December 28th.

63.     Plaintiffs waited until the last minutes of the business day on December 28th, and at that point signed the settlement agreement and transferred the money at 4:59 PM.

64.     Plaintiffs emailed Beazley the finalized settlement documents at 5:33 p.m., December 28th.

65.     Later that evening, Beazley finally sprang into action by implicitly denying the claim on the basis that it had not had enough time to review the documents, was therefore not in a position to consent to settlement, and that "[b]ecause the Insured has entered into a settlement without Underwriters' participation and consent as required by the Policy, **the insured should proceed as a prudent uninsured**." (Emphasis added.)

> From: William Clarke (William.Clarke@beazley.com)
> Sent: Fri 12/28/2012 06:45 PM
> Rcvd: Fri 12/28/2012 06:45 PM
> To: Stephen Kravit; Kimberly S. Vitrano
> CC: Mark M. Leitner; Allison A. Schmidt
> Subject: RE: RE: Equity Holders in Packerland Whey Products / Policy W0009312PYBW
>
> ==========================================
>
> Mr. Kravit:
>
> Thank you for forwarding the group of correspondence (which is more than 100 items) to us in connection with the submitted potential claim and in response to our request.
>
> As I am sure you can appreciate, having only received notification of a potential claim after London business hours on Christmas Eve and only receiving the beginning of the settlement-related correspondence late yesterday afternoon Underwriters are not in a position to consent to the settlement referenced in your e-mail below. In this regard, we would like to call to your attention Section X.D. of the Policy which states the rights and responsibilities of both Underwriters and the Insured as it relates to settlement.
>
> Underwriters will continue to evaluate the materials that have been submitted to us over the past 24 hours and will offer the insured a coverage opinion in due course. Because the insured has entered into a settlement without Underwriters' participation and consent as required by the Policy, the insured should proceed as a prudent uninsured.
>
> Finally, Underwriters continue to reserve their rights under the Policy and any applicable law.

66.     The plain and unmistakable meaning of Beazley's December 28, 2012 communication was to advise the Sellers that Beazley intended to, and was in fact, denying coverage for the Sellers claim under the Policy.

## VI.   *Formal Denial of Coverage & Coverage Misrepresentations*

67.     On March 5, 2013, two months after Sellers first gave Beazley the opportunity to associate in the defense and comment and consent to settlement prior to its finalization, Beazley finally completed its claims review by denying the claim and issuing a formal claims denial letter.

68.     The claim denial letter is remarkable in that Beazley justifies its claim denial by misrepresenting and construing the Policy so tortuously, that if correct, it would result in the policy being illusory, insuring nothing at all.

69.     The first misrepresentation in the claims denial letter is where Beazley argues that there is no coverage under the Policy for General Warranties. Beazley states that, because the Acquisition Agreement caps available damages for breaches of general warranties at $1.5 million, and the Policy has a $1.5 million dollar retention, that: "[a]t a minimum, any amount paid over that sum must be attributable to the resolution of uncovered claims (whether asserted against the Insureds or otherwise), for which Beazley bears no responsibility. (Ex. B, pp. 10-11.)

70.     The second and third coverage misrepresentations in the claims denial letter are where Beazley states because the settlement was an adjustment to the purchase price, the overpayment for the company compensated the buyer for consequential damages, and "[t]he Policy does not provide coverage for consequential damages and as such coverage is not available for the settlement." (Ex. B, pp. 11-12.)

71.     As "support" for its position that the policy does not provide coverage for diminution in value damages, Beazley misquotes policy Clause III.Q by leaving out the language in the first sentence that states a loss includes diminution of value claims.  In its claim denial letter, Beazley quotes Clause III.Q. as follows:

> Loss means actual damages which the Insured is contractually obligated to pay as the result of a Breach or Third Party Demand and any Defense Costs arising from a Breach or Third Party Demand, in accordance with the Acquisition Agreement; provided that Loss shall not include:

        i.      civil fines or penalties (but only to the extent that such fines or penalties are uninsurable by law) or criminal fines or penalties;

        ii.     consequential, special or indirect loss or damage, punitive or exemplary damage, or the multiplied portion of multiplied damages (whether based upon an alleged pricing multiple or otherwise), except for such loss or damage awarded against the Insured or Target Group pursuant to a final judgment by a court of competent jurisdiction or arbitrational panel in connection with the resolution of a Third Party Demand; or

        iii.    Injunctive, equitable or other non-monetary relief (except for Defense Costs related thereto) and the Underwriters shall not be obligated to seek, pursue or satisfy any non-monetary remedies.

(Ex. B., pp. 11 - 12.)

        72.    In the Policy, the real Clause III.Q., quoted directly below, includes the words ", including without limitation diminution in value,":

Loss means actual damages**, including without limitation diminution in value,** which the Insured is contractually obligated to pay as the result of a Breach or Third Party Demand and any Defense Costs arising from a Breach or Third Party Demand, in accordance with the Acquisition Agreement; provided that Loss shall not include:

        i.      civil fines or penalties (but only to the extent that such fines or penalties are uninsurable by law) or criminal fines or penalties;

        ii.     consequential, special or indirect loss or damage, punitive or exemplary damage, or the multiplied portion of multiplied damages (whether based upon an alleged pricing multiple or otherwise), except for such loss or damage awarded against the Insured or Target Group pursuant to a final judgment by a

> court of competent jurisdiction or arbitrational panel in connection with the resolution of a Third Party Demand; or
>
> iii.  Injunctive, equitable or other non-monetary relief (except for Defense Costs related thereto) and the Underwriters shall not be obligated to seek, pursue or satisfy any non-monetary remedies.

(Ex. A, p. 5, Clause III.Q.)(emphasis added)

73.    The real Clause III.Q. is in accord with the Acquisition Agreement itself, which requires that all indemnification payments be treated as an adjustment to the Purchase Price.

74.    If, as Beazley claims in its denial letter, the Policy does not provide coverage for revaluation of the Company for alleged overpayments, then the policy would provide no coverage for breaches of any warranty because all of those damages are treated as adjustments to the purchase price, rendering the policy illusory.

75.    The time deadline placed on Plaintiffs by the Buyers and their lenders was real. Plaintiffs did everything reasonably practicable to comply with the terms of the notice and settlement provisions of the Policy. Sellers were required to, and at all time complied with Clause XII (B) of the Policy, which requires insureds to "act at all times as if uninsured and take all reasonable action necessary or reasonably advisable to mitigate any Loss or potential Loss."

76.    Plaintiffs deny they have failed to follow any provision of the Policy, but if it is determined that there was an issue with the Notice, Beazley was not prejudiced.  Even if Beazley had been participated in the negotiations from the

start, it would have been impossible for Beazley to obtain a more favorable result in this settlement than was in fact obtained by Plaintiffs.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment on Coverage**
**(Against All Defendants)**

77.     Plaintiffs reallege Paragraphs 1 – 76 as if set forth in full.

78.      Based on Beazley's December 28, 2012 directive to the Plaintiffs that they should "proceed as a prudent uninsured," and Policy Condition XII.B. that requires insureds to act "at all times as if uninsured and take all reasonable action necessary or reasonably advisable to mitigate any Loss or potential Loss", and Beazley's refusal to investigate, participate in settlement, consent to settlement, and subsequent denial of coverage, there exists a case and an actual and justiciable controversy between the Plaintiffs and the Defendants regarding the interpretation of certain terms, conditions, exclusions, and limitations within the Policy and whether the Policy provides coverage to Plaintiffs, all within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

79.     Plaintiffs seek a declaration that the Policy provides indemnity coverage and that Defendants have a duty to reimburse Plaintiffs for past defense costs expended defending and settling the claim and the cost of settlement.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**(Against All Defendants)**

80.     Plaintiffs reallege Paragraphs 1 – 79 as if set forth in full.

81.     The Policy is a contract between Plaintiffs and Beazley.

82.     The Policy bars Beazley from unreasonably withholding its consent to settle.

83.     Beazley breached the Policy by unreasonably withholding its consent to settle.

84.     The Policy bars Beazley from unreasonably delaying its consent to settle.

85.     Beazley breached the Policy by unreasonably delaying its consent to settle.

86.     The Policy bars Beazley from unreasonably conditioning its consent to settle.

87.     Beazley breached the Policy by unreasonably conditioning its consent to settle.

88.     The Policy requires Beazley to indemnify and pay defense costs for claims based upon a breach of the general warranties.

89.     Beazley breached the Policy by refusing to indemnify and pay defense costs for the alleged breaches of general warranties.

90.     The Policy requires Beazley to indemnify and pay defense costs for claims based upon a breach of the fundamental and tax warranties.

91.     Beazley breached the Policy by refusing to indemnify and pay defense costs for the alleged breaches of fundamental and tax warranties.

92.     The Policy requires Beazley to indemnify and pay defense costs for claims based upon a breach of the trade secrets warranty.

93.     Beazley breached the Policy by refusing to indemnify and pay defense costs for any alleged breaches of trade secrets warranty.

94.     As a direct result of each and every of the aforementioned breaches of the Policy, Plaintiffs have suffered damages in an amount to be determined at trial, including, but not limited to, the full amount of settlement and the defense costs required to achieve settlement.

### THIRD CLAIM FOR RELIEF
#### *Illusory Coverage – Reformation*
#### *(Against All Defendants)*

95.     Plaintiffs reallege Paragraphs 1 – 94 as if set forth in full.

96.     Plaintiffs paid a significant, $160,000 premium for coverage.

97.     The Policy was represented to provide $10,000,000 in coverage for general warranties, fundamental and tax warranties, and trade secrets warranties.

98.     Item 7A of the Declarations states that coverage is provided for the general warranties.

99.     As interpreted by Beazley in its claim denial letter, in actuality the Policy does not provide *any* coverage for general warranties.

100.    Under Beazley's interpretation of the Policy, it does not have to cover any claims for general warranties because the Acquisition Agreement contains a $1,500,000 liability cap for breaches of general warranties, and the Policy has a $1,500,000 self-insured retention requirement.  According to Beazley in its claim denial letter, these two provisions, Section 8.8(b) of the Acquisition Agreement

(incorporated by reference into the Policy) and Item 9 of the Policy Declarations (Retention requirement) operate in tandem to, in actuality, bar all coverage for breaches of the general warranties, which render the policy coverage for general warranties illusory.

101.    Beazley has also denied coverage under its view that the Policy does not provide coverage for adjustment of purchase price/diminution of value damages because such damages are excluded by the policy as consequential damages.

102.    Under the terms and conditions of the Acquisition Agreement, any indemnification payments made to the buyer for breaches of any warranty or representation, such as the ones at issue in the Packerland Claim, are required to be treated as an adjustment to the Purchase Price.

103.    If the Policy does not provide coverage for damages classified as revaluation of the Company/diminution of value of the company, then coverage under the Policy is illusory.

104.    "[A] policy provision is illusory if it defines coverage so that, in practice, it will never be triggered." *Allstate Ins. Co. v. Gifford*, 178 Wis. 2d 341, 349, 504 N.W.2d 370.

105.    Beazley has interpreted its Policy in such a way that the promised general warranty coverage is illusory, and can never be triggered.

106.    Beazley has further interpreted its Policy in such a way that there would be no coverage for any indemnification damages under the Acquisition

Agreement, which renders promised indemnification coverage for breaches of any of the warranties and representations illusory.

107.    Plaintiffs reasonably believed they had $10,000,000 of liability coverage for breaches of any warranties and representations, and that said coverage was unaffected by any liability cap limitations in the Acquisition Agreement.

108.    The Policy should be reformed to provide Plaintiffs with the coverage they paid $160,000 for and reasonably believed they had.

### FOURTH CLAIM FOR RELIEF
***Declaration of Illegal Policy Under Wis. Ch. 618 For Failure Of Defendants to Comply with Wis. Stat. §618.41(4) and Wis. Admin. Code INS 6.17(3)(a) (Against All Defendants)***

109.    Plaintiffs reallege Paragraphs 1 – 108 as if set forth in full.

110.    Beazley is an unauthorized insurer doing insurance business in Wisconsin without a certificate of authority.

111.    The Beazley Policy was issued as a surplus lines policy pursuant to Wis. Stat. §618.41

112.    Pursuant to Wis. Stat. §618.41(4) and Wis. Admin. Code Ins §6.17(3)(a), prior to issuance of any surplus lines policy in Wisconsin, the surplus lines agent and/or insurer must promptly forward notice to the potential insured, in a form prescribed or approved by the commissioner of insurance that is substantially similar to the Surplus Lines Insurance Proposal Ins 6.17 Appendix 1, that notifies the potential insured that the proposed insurer has not obtained a certificate of authority to do business in Wisconsin and is not regulated in Wisconsin except as provided in Wis. Stat. §618.41.

113.    Wis. Stat. Ch. 618 is a safety statute designed to protect the public from unfair and prejudicial insurance practices.

114.    The Policy was issued in violation of Wis. Stats. Ch. 618.41(4) and Wis. Admin. Code Ins §6.17(3)(a) because the requisite Surplus Lines Insurance Proposal notice was not sent or provided to Plaintiffs prior to issuance of the policy.

115.    Wis. Stat. §618.44 states that an insurance contract issued in violation of Ch. 618 is illegal, and unenforceable by, but enforceable against, the insurer.

116.    Plaintiffs seek a declaration that the Policy is an Illegal policy.

117.    In addition, if the Court rules that Plaintiffs are not entitled to coverage, then Plaintiffs seek a return of the premium they paid for the illegal policy.

## FIFTH CLAIM FOR RELIEF
### *Bad Faith Investigation, Association, and/or Consent To Settlement (Against Beazley)*

118.    Plaintiffs reallege Paragraphs 1 – 117 as if set forth in full.

119.    Plaintiff was faced with a significant potential over-limits policy exposure and a tight settlement deadline, after which potential damages, and its over-limits exposure, had the potential to increase.

120.    Beazley had a duty to not unreasonably refuse to investigate, not unreasonably refuse to associate in settlement, and/or not unreasonably withhold consent to settlement upon notice of a claim.

121.    Beazley underwrote the Policy by detailed review of the Acquisition Agreement, and incorporated the Acquisition Agreement into the Policy itself.

122.    Due to the targeted, unique nature of the Policy at issue, which was underwritten to specifically cover breaches of various warranties in the Acquisition Agreement, when Beazley received a draft of the Complaint on December 24, it had everything it needed to immediately understand the scope of the claims at issue and whether they were covered.

123.    Despite the potential over-limits exposure and the tight deadline, Beazley dragged its heels, and refused to immediately investigate the claim, associate in the settlement discussions, and refused to review and consent to settlement.

124.    Beazley's refusals were in spite of the fact that Plaintiffs had a year-end settlement window deadline, that if not met, would have potentially added additional over-limits damages.

125.    Beazley's refusals to immediately associate in the settlement discussions and refusals to review and consent to settlement in time to meet the deadlines imposed by the Buyers were unreasonable, and done with intent and knowledge, or reckless disregard, and without a reasonable basis.

126.    Beazley's refusals were further done with wanton disregard of its duty, constituted gross and/or outrageous conduct, and were performed with evil intent and/or ill will that is deserving of punishment, including, but not limited to, punitive damages.

127.    Plaintiffs have been damaged by Beazley's bad faith actions in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### *Bad Faith Denial of Coverage*
### *(Against Beazley)*

128.    Plaintiffs reallege Paragraphs 1 – 127 as if set forth in full.

129.    In order to support its denial of coverage, Beazley has misrepresented both the policy terms, and the available coverage in its March 5, 2013 claim denial letter.

130.    Beazley's misrepresentations were made with the intent to trick plaintiffs into believing there was no available coverage, when in actuality, there is available coverage.

131.    Beazley's misrepresentations were made with intent and knowledge, or reckless disregard, and without a reasonable basis.

132.    Beazley's misrepresentations were further made with wanton disregard of its duty, constituted gross and/or outrageous conduct, and were performed with evil intent and/or ill will that is deserving of punishment, including, but not limited to, punitive damages.

133.    Plaintiffs have been damaged by Beazley's bad faith actions in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### *Violation of Wis. Stat. §628.46*
### *(Against Beazley)*

134.    Plaintiffs reallege paragraphs 1 – 133 as if set forth in full.

135.    Wis. Stat. §628.46 requires insurers to pay claims within 30 days of the claim submission.

136.    Wis. Stat. §628.46 is a safety statute designed to protect the public from unfair and prejudicial insurance practices.

137.    The Ratajczaks' submitted their claim for coverage on December 28, 2012.

138.    Beazley failed to pay the Ratajczaks' claim within 30 days of claim submission, and had no reasonable basis to deny payment of the claim.

139.    Plaintiffs were financially harmed by Beazley's violation of Wis. Stat. §628.46 in an amount to be determined at trial, including, but not limited to, unpaid interest on each of his six claims at a simple interest rate of 12% per year.

WHEREFORE, plaintiffs demand judgment as follows:

1.    An award of actual damages;

2.    A declaration that the Policy provides coverage for the payments made, defense costs incurred, and damages suffered by the Sellers under the settlement entered into between the Sellers and the Buyers on December 28, 2012, and that the Limit of Liability under the Policy should be paid to Plaintiffs;

3.    A declaration that the Policy is an illegal policy;

4.    A declaration that Beazley is barred from relying upon its policy exclusions and limitations to deny and/or limit the coverage available; or in the alternative, if the Court rules that Plaintiff is

not entitled to coverage, then a return of the premium paid for the Policy;

5. An award of bad faith damages;

6. Statutory interest on the unpaid claim;

7. Punitive damages for Bad Faith and illegal policy;

8. Attorney's fees; and

9. Such other and further relief as the Court deems just and proper.

### DEMAND FOR A TWELVE PERSON JURY
### AS TO ALL TRIABLE ISSUES

KRAVIT, HOVEL & KRAWCZYK S.C.

/s/ Jon E. Fredrickson
Christopher J. Krawczyk
Jon E. Fredrickson
Benjamin R. Prinsen
Attorneys for Plaintiffs

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson - Fifth Floor
Milwaukee, WI 53202
(414) 271-7100 - Telephone
(414) 271-8135 - Facsimile
kravit@kravitlaw.com

Dated: November 11, 2013