# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DANIEL J. RATAJCZAK, JR., et al.,

        Plaintiffs,

    v.                                   Case No. 13-C-45

BEAZLEY SOLUTIONS LIMITED, et al.,

        Defendants.

---

## DECISION AND ORDER

---

Daniel and Scott Ratajczak owned 100% of the stock of Packerland Whey Products, Inc., (Packerland), a Wisconsin corporation located in Green Bay. In May 2012, the Ratajczaks sold their stock to an affiliate of Granite Creek Partners named Packerland Whey Intermediary Holding Company (Packerland Intermediary) pursuant to a Stock Purchase Agreement (SPA). In connection with the sale, the Ratajczaks purchased a Warranty and Indemnity Insurance Policy from Defendant Beazley Solutions Limited covering certain representations and warranties they made in the SPA. In late November 2012, Peter Lehman, a principal of Granite Creek, accused the Ratajczaks of defrauding the buyer by failing to disclose and/or misrepresenting the fact that Packerland was secretly adding urea to its leading product. Lehman threatened to sue and bring criminal charges against Daniel Ratajczak. Shortly thereafter, Lehman sent the Ratajczaks' attorney a draft of a civil complaint he was planning to file alleging a number of tort claims, including fraud, as well as claims for breach of various warranties contained in the SPA. In late December 2012 the Ratajczaks entered into a settlement agreement with Packerland Intermediary under which they paid $15 million

in cash and concessions. Daniel and Scott, along with their wives, (collectively, "Plaintiffs") then demanded indemnification from Beazley for their loss, and when Beazley refused, commenced this diversity action against Beazley alleging that it acted in bad faith and breached its duty to indemnify them. In their second amended complaint, Plaintiffs also allege that the coverage of the policy is illusory, entitling them to reformation of certain provisions; that Beazley issued the Policy in violation Wisconsin insurance laws and regulations governing out-of-state surplus lines insurers; and that Beazley violated Wisconsin law by failing to pay the claim within thirty days of submission. The case is before the court on Plaintiffs' motion for partial summary judgment and Beazley's motion for summary judgment. For the reasons that follow, Plaintiffs' motion will be denied and Beazley's motion will be granted.

## BACKGROUND

**1. The Sale of Packerland Whey**

On May 15, 2012, brothers Daniel and Scott Ratajczak sold their stock in Packerland to a holding company created by Granite Creek named Packerland Whey Intermediate Holding Company (hereinafter, "Buyer"). (ECF No. 198, 199.) Under the terms of the SPA, Buyer paid $23.425 million, $4.1 million of which was withheld and deposited into two escrow accounts to be distributed in the future to the holding company, the Ratajczaks, or both parties, depending on several contingencies. An additional $3 million of the purchase price was set aside for creditors of Packerland and professionals involved in the transaction, leaving more than $16 million for the Ratajczaks themselves, of which they reinvested $2.288 million in the stock of the parent company of Buyer. (ECF No. 198, SPA §§ 1.2. 2.1.)

2

The SPA set forth a number of representations and warranties that the Ratajczaks made to the buyer. (ECF No. 198, SPA, Art. III, IV.) For breach of certain of the representations or warranties, the SPA provided that the aggregate amount the Ratajczaks would be required to pay "shall not exceed $1,500,000." That limit did not apply, however, to breaches of what the SPA referred to as the "Fundamental Representations," which were set out in twelve sections of the SPA, or to a specific trade secret warranty. (ECF No. 199, S.P.A. §§ 8.1, 8.8, 8.9.)

## 2. The Beazley Insurance Policy

Under the terms of the SPA the Ratajczaks were required to obtain insurance for certain potential breaches of the warranties in the SPA and, with the assistance of counsel, negotiated the terms of coverage with Beazely. To fulfill this obligation, they purchased a Seller's Warranty and Indemnity Insurance Policy from Beazley. The Policy states that the Insured (defined to include Daniel and Scott Ratajczak) were "represented by competent and experienced legal counsel of their choice in connection with this Policy" and bought the Policy "with full knowledge and acceptance of its terms and conditions." (ECF No. 2 at 14.) The Policy, which is governed by New York law, insures the Ratajczaks against claims for breaches of certain representations and warranties in the SPA, including various general warranties, subject to the Policy's terms, conditions, and exclusions. The Limit of Liability is $10 million, with a Retention of $1.5 million. It also mandated that any notices required under the Policy to be sent to Beazley's home office in London and by email. (ECF No. 2 at 2.)

Under the terms of the Policy, Beazley was to "indemnify the Insured for, or pay on its behalf, Loss, in excess of the Retention but not in excess of the Limit of Liability, on account of a Breach or Third Party Demand, provided that each Breach or Third Party Demand is first reported

3

to the Underwriters in accordance with the terms of this Policy." (ECF No. 2 at 4.) "Loss" is defined as "actual damages, including without limitation diminution in value, which the Insured is contractually obligated to pay as the result of a Breach or Third Party Demand and any Defense Costs arising from a Breach or Third Party Demand, in accordance with the [SPA]." (ECF No. 2 at 5.) The Policy specifies that "Loss shall not include . . . non-monetary relief," such as "injunctive" and "equitable" relief. A Breach consists of any breach of the insured representations and warranties, while a Third Party Demand is defined as "any demand made or legal action brought" against the Ratajczaks "resulting from an actual or alleged Breach." The Policy further states that Beazley's obligations "shall be net of any amounts actually recovered by the Insured," including "any tax savings or benefits actually received by the [Ratajczaks] that are specifically attributed to any deduction, loss, credit or other tax benefit resulting from or arising out of such Loss." (*Id.*)

Sections IX and X of the Policy dictate terms for giving notice of Breach or Third Party Demand and for defense and settlement of covered claims. The Policy required the Insured to deliver notice of a Breach or Third Party Demand to the Underwriters as soon as reasonably practicable after the CEO, CFO, or General Counsel of the Insured becomes aware of the Breach or Third Party Demand. "For the avoidance of doubt, the Insured shall deliver such notice in each such instance regardless of whether the matters described in such notice will, or are reasonably expected to, give rise to Loss that is within the Retention." (ECF No. 2 at 9.) While Beazley had "no duty to defend," under the terms of the Policy, it was required to reimburse the insured for defense costs as part of any Loss, subject to the Retention and Limit of Liability. The Policy afforded Beazley the right "to participate fully in the defense, negotiation and settlement of any . . . Third Party Demand." Thus, the Policy provided:

4

> The insured shall (without limitation) . . . not settle, compromise or discharge any Breach or Third Party Demand without prior consultation with and the prior written consent of [Beazley] (such consent not to be unreasonably withheld, conditioned or delayed).

(ECF No. 2 at 10.) The Insured was also required to provide the Underwriters with "copies of all correspondence, pleadings . . . and other documents" related to the breach and "to the extent possible afford the Underwriters sufficient time in which to review and comment on such documentation." *Id.* Furthermore, Section XII.B of the Policy requires that the "Insured shall . . . act at all times as if uninsured and take all reasonable action necessary or reasonably advisable to mitigate any Loss or potential Loss." *Id.* at 11.

### 3. WPC-34, The Threatened Lawsuit, and The Agreement to Settle

At the time of the sale of the company, Packerland Whey sold a product known as WPC-34. WPC stands for "whey protein concentrate"; 34 refers to 34% protein. During 2011, the last full year prior to the sale, 64% of Packerland Whey's $17,537,094 reported income resulted from sales of WPC-34. During the first quarter of 2012, the last full quarter prior to the sale, over 67% of Packerland Whey's $5,050,894 reported income resulted from sales of WPC-34.

In late November 2012, the Buyer of Packerland Whey claimed to have learned that the Ratajczaks had directed employees to use urea, a source of non-protein nitrogen, as an input in the manufacture of WPC-34. The Buyer asserted that "the use of urea to manufacture WPC-34 was not disclosed prior to the close of the [sale] transaction;" that the "undisclosed use of urea in the manufacture of WPC-34 caused the revenues and profits of that business line to be overstated, in turn, impacting the valuation ascribed to the business"; and that the "use of urea in the manufacture of WPC-34 caused the company to be in breach of the contracts it held with two key customers."

5

(ECF No. 190-1 at 11.)  More specifically, on November 26, 2012, Peter Lehman contacted Daniel Ratajczak by phone and stated that Packerland Whey had been "adulterating it's [sic] WPC-34 product sold to Milk Specialties Nutrition ('MSC') by adding Urea to boost the measured protein content."  On December 6, 2012, Lehman and Daniel Ratajczak met in Green Bay to discuss the accusations.  Throughout the course of the meeting, Lehman threatened Mr. Ratajczak with litigation and criminal prosecution for illegally adding urea to the WPC-34.

On December 8, 2012, Attorney Thomas Olejniczak, the Ratajczaks' lawyer, met with the Buyer's attorneys and worked out a settlement.  On December 11, 2012, Olejniczak requested a copy of the draft complaint which the Buyer's attorneys had displayed to him at their previous meeting.  Later that same day counsel for the Buyers sent Olejniczak a copy of the draft complaint along with a draft settlement agreement.  The draft settlement agreement provided for the Ratajczaks to return $10 million to the Buyer, to surrender their stock in the Buyer, and to waive any claims to the escrowed funds.  The draft complaint asserted claims for fraud, negligent misrepresentation, conspiracy to commit fraud, breach of contract, breach of fiduciary duty, injunctive relief, constructive fraud, and rescission.  (ECF No. 205.)  In support of the breach of contract claim, the complaint alleged that the Ratajczak's use of urea rendered the following representations and warranties in the SPA false and misleading: that Packerland had no contingent liabilities (SPA § 3.11); that Packerland was not in breach of any of its material contracts (SPA § 3.14); that there was no basis for a future suit against Packerland (SPA § 3.19); that all of Packerland's products conformed to its customers' requirements (SPA § 3.32); and that the Ratajczaks had fully disclosed in writing all material facts to Granite Creek (SPA § 3.39).  (ECF No. 205, ¶¶ 63–98.)

6

By December 17, 2012, the Ratajczaks had retained new counsel. On December 21, 2012, after further negotiations, their new attorney circulated a revised draft Settlement Agreement which differed from the earlier proposal only in requiring the Ratajczaks to return $9.75 million of the purchase price for Packerland, instead of the $10 million called for in the original proposal. The Ratajczaks were still required to surrender their stock in the Buyer's parent company and waive any claims to the escrowed funds.

Beazley was given notice of the third party demand on Christmas Eve, December 24, 2012, at 7:30 p.m. London time (1:30 p.m. Wisconsin time). The letter stated that it was a "Notice of a Third Party Demand" under the Policy; informed Beazley that the Packerland Holding asserted "in early December, 2012" that the Insureds had breached representations and warranties in the SPA; attached the draft Buyer Complaint; and announced that "the Insureds intend to settle the Third Party Demand in accordance with the time frame demanded by the Buyer in order to mitigate damages, if that proves at all possible." The letter did not disclose the proposed settlement terms or ask for Beazley's consent to a settlement.

On December 27, 2012,[1] Beazley's claims adjuster responded to the Ratajczak's December 24 notice by acknowledging that settlement was proceeding at a fast pace, reserving all of its rights to deny coverage, and demanding all correspondence that related to the settlement talks. Later in the day on December 27, Plaintiffs' counsel began sending Beazley copies of settlement communications, with sets of documents being sent to Beazley in waves.

---

[1] Both December 25, 2012 (Christmas Day) and December 26, 2012 (Boxing Day) were national holidays in the United Kingdom.

7

Just before 3:00 p.m. on Friday December 28, Kravit advised Beazley that settlement absolutely had to be consummated by the close of business on the 28th, and enclosed a new draft of the "nearly final settlement agreement." Kravit did not ask for Beazley's consent to the settlement. The Ratajczaks officially settled the threatened lawsuit with the transfer of the settlement monies ($9,766,222.94) at approximately 5:00 p.m. (Wisconsin time) on December 28. Kravit's paralegal sent the final settlement email correspondence to Beazley later during the evening of December 28, after the settlement was finalized. That same evening Beazley sent Kravit an email which stated in part:

> Underwriters are not in a position to consent to the settlement referenced in your email below. In this regard, we would like to call to your attention Section X.D. of the Policy which states the rights and responsibilities of both Underwriters and the Insured as it relates to settlement. . . . Underwriters will continue to evaluate the material that have been submitted to us over the past 24 hours and will offer the insured a coverage opinion in due course. Because the insured has entered into a settlement without Underwriters' participation and consent as required by the Policy, the insured should proceed as a prudent uninsured.

Kravit Dep., Ex. 16 at 11, ECF No. 206. Beazley provided its coverage opinion on March 5, 2013, denying coverage of the Ratajczak's claim. Beazley has since stated that it would have denied the Ratajczak claim regardless of when notice was given.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.; *see also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are

8

those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

## B. No Loss in Excess of the Retention

Beazley first argues it is entitled to summary judgment because Plaintiffs cannot establish a covered Loss in excess of the Policy's Retention amount. The Policy states: "Underwriters shall indemnify the Insured for, or pay on its behalf, Loss, in excess of the Retention but not in excess of the Limit of Liability, on account of a Breach or Third Party Demand." Insurance Policy, Ex. A, at 2, ECF No. 2. The Retention amount set forth in the Policy is $1.5 million in the aggregate. Additionally, the Policy is a Seller's Warranty And Indemnity Insurance Policy under which Beazley is required to pay only covered Losses "which the Insured is contractually obligated to pay." *Id.* at 5. Though there is no cap on liability for breach of one of the SPA's Fundamental Representations, the SPA provides that in the event of a breach of one or more general warranties, the Ratajczaks' liability would be capped at $1.5 million. Beazley argues that because the Buyer's draft complaint only alleged breaches of the general warranties, the most that Plaintiffs can prove is a loss of $1.5 million—the same as the Retention amount. Because Plaintiffs' maximum possible covered Loss of $1.5 million does not exceed the retention amount, Beazley contends it is not required under the policy to indemnify Plaintiffs for the settlement amount they paid.

Beazley is correct that Buyer's draft complaint explicitly alleged only violations of the general warranties for which the SPA limited Plaintiffs's aggregate liability to $1.5 million, the Retention

9

amount of the Policy. The Policy covers only liability for Loss that Plaintiffs were contractually obligated to pay. The draft complaint lists both contract and tort claims for relief seeking compensatory and punitive damages, as well as equitable forms of relief—all of which were settled by Plaintiffs within a week of notifying Beazley of the existence of the claim. Nothing in the Policy obligates Beazley to indemnify Plaintiffs for any liability they may have incurred for compensatory and punitive damages for fraudulent misrepresentation, negligent misrepresentation, conspiracy to commit fraud, and breach of fiduciary duty. Though the Policy covered Loss resulting from Plaintiffs' breach of representations and warranties in the SPA, the claims asserted in the draft complaint included allegations that the Ratajczaks had breached only general warranties. (SPA §§ 3.11, 3.14, 3.19, 3.32, 3.39). Under the SPA, those contract claims could, therefore, at most have aggregated to $1.5 million. Given that the retention amount is also $1.5 million and Plaintiffs have waived their right to defense costs, Plaintiffs cannot possibly show a loss covered by the Policy in excess of the retention amount unless they can show they also faced liability for breach of one of the fundamental warranties.[2]

In response, Plaintiffs argue that a fair reading of the Buyer's complaint supports a claim for breach of one of the fundamental warranties contained in the SPA. They contend that the mere fact that the Buyers did not explicitly cite one of the SPA's Fundamental warranties does not mean no such breach is alleged. Under federal notice pleading standards, Plaintiffs contend, the pleader need not cite the specific statute or contract provision at issue in order to state a claim for its violation. "Plaintiffs need only plead facts, not legal theories, in their complaints." *Hatmaker v. Mem'l Med.*

---

[2]Though Beazley admits that it could potentially be liable for Plaintiffs' defense costs in negotiating the settlement agreement, Plaintiffs have withdrawn their request for defense costs so that their attorney's work does not become at issue in this case.

10

*Ctr.*, 619 F.3d 741, 742 (7th Cir. 2010). Under this standard, Plaintiffs contend, the draft complaint's allegations state a claim for a breach of the warranty set forth in § 3.3 of the SPA. And since the warranty in § 3.3 is a fundamental warranty, Plaintiffs argue the SPA's $1.5 million cap does not apply and Beazley could be liable for some portion of the Loss paid by Plaintiffs under the settlement agreement up to the $10 million policy limit.

A fair reading of the complaint does not support Plaintiffs' argument. Section 3.3 of the SPA is entitled "Organizational Documents." It reads:

> The Company has delivered to the Buyer copies of the Company's Organizational Documents, and all such copies are complete and correct as of the date hereof, and include all amendments thereto. Schedule 3.3 contains a complete and correct list of the current directors and officers of the Company. The minute books of the Company previously delivered to the Buyer contain true, complete and correct records of all stock records of the Company and all meetings held (or written consents in lieu thereof), and accurately reflect all issuances and transfers of Equity Interests and all other action of the stockholders and board of directors of the Company. The books of account and other records of the Company delivered to the Buyer have been maintained in accordance with sound business practice, and applicable law and accounting policies. The Company is not in default under or in violation of any provision of its Organizational Documents.

(ECF No. 198, SPA § 3.3.) The claims asserted in the Buyer's draft complaint that Plaintiffs settled were not for Plaintiffs' breach of the warranties or representations in Section 3.3. of the SPA. The Buyer's allegations were not that Plaintiffs organizational documents were wrong or that they violated sound accounting practices; the Buyer's claim was that Plaintiffs failed to disclose the fact that the company was adding urea to WPC-34. The draft complaint did allege that "[t]he addition of urea during the manufacturing process of WPC-34 caused increased production of WPC-34 than otherwise would have been produced, which further falsely inflated revenues and profits, for the WPC-34 product line." (ECF No. 205 ¶ 43.) But the fact that the addition of urea may have inflated

11

revenues and profits does not mean that the books were not properly maintained. There was no allegation that the revenues and profits were misstated; nor was there any allegation that the Company had not maintained its books of account and other records in accordance with sound business practices, and applicable law and accounting policies in violation of Section 3.3 of the SPA.

In contrast, the Buyers asserted in their draft complaint that Plaintiffs breached Section 3.11 of the SPA, which warranted there was no basis for any present or future legal proceeding against the Company, because they knew they were delivering non-conforming goods to its customers. (ECF No. 205 ¶¶ 65, 66.) The Buyers claimed Plaintiff's breached Section 3.19, which warranted they had no knowledge of any basis for litigation against the Company because they knew the Company was in breach of contracts with two of its key customers. (ECF No. 205, ¶¶ 69, 70.) The Buyers alleged Plaintiffs were in breach of Section 3.32, which warranted that each product sold by the Company was being sold in conformity with contractual requirements, because they added urea to WPC-34 in violation of their contract. And finally, the Buyers alleged Plaintiffs breached Section 3.39, which warranted that they had disclosed all facts and circumstances that could give rise to material adverse effect, by failing to disclose that they were adding urea to WPC-34. (ECF No. 205, ¶¶ 74-76.) It was the Buyer's claim that Plaintiffs had breached these warranties, not the warranty regarding the company's organizational documents, that Plaintiffs settled.

Beazley cites *Caterpillar, Inc. v. Great Am. Ins. Co.* in support of its argument that an insurer is not liable for settlement costs attributable to a claim that was never asserted in the underlying action. 62 F.3d 955 (7th Cir. 1995). But *Caterpillar* is really a case about allocation of liability between an insurer and its insureds where both covered and non-covered claims are asserted. Here, for the reasons set forth above, I conclude that the Buyer's draft complaint failed to allege any

12

covered claims against Plaintiffs other than those for breach of the general warranties. Since Plaintiffs' liability for breach of these warranties was capped at $1.5 million, the amount of the retention, and since Plaintiffs waived any costs of defense, Beazley has no liability under the Policy.

Plaintiffs' argument that the Policy is illusory also fails. This is demonstrated by the fact that there are numerous situations where Beazley could be liable under the Policy. *See Cont'l W. Ins. Co. v. Paul Reid, LP, GPS, Inc.*, 2006 WI App 89, ¶ 7, 715 NW.2d 689 ("Illusory policy language defines coverage in a manner that coverage will never actually be triggered."). For example, had Plaintiffs not waived any right to defense costs in this case, Beazley could have been liable for those amounts. Beazley also could have been liable for up to $10,000,000 had Plaintiffs been found liable for breach of a fundamental warranty. Beazley presumably negotiated a $1,500,000 retention amount in order to minimize its exposure in the event that Plaintiffs breached general warranties, but that does not render the policy illusory. It is entirely reasonable that an insurance policy would only trigger coverage once liability became unmanageable (too expensive) for the insured. Many insurance policies have retention or deductible provisions. A $1.5 million retention is reasonable for a policy covering a transaction in which the sellers are receiving over $23 million in payment. Furthermore, Plaintiffs' challenge to the incorporation of the SPA into the Policy is confusing at best, given Plaintiffs' attempt in this case to seek loss amounts under the Policy for breaches of fundamental warranties of the SPA.

Therefore, I find that Plaintiffs have failed to establish a loss in excess of the retention amount and summary judgment should be granted to Beazley on all claims.

13

**C. No Prior Written Consent**

Alternatively, Plaintiffs' claim fails because they did not obtain Beazley's consent before entering into the settlement agreement with the Buyer. Sections X.D of the Policy requires that the "Insured shall (without limitation): (i) not settle, compromise or discharge any Breach or Third Party Demand without prior consultation with and the prior written consent of the Underwriters (such consent not to be unreasonably withheld, conditioned or delayed)." Insurance Policy, Ex. A, at 10, ECF No. 2. It is undisputed that the Insured, the Ratajczaks, settled a Third Party Demand without the prior written consent of the Underwriter. Beazley argues that consent-to-settle provisions will be enforced under either Wisconsin or New York law without having to prove prejudice. But even if proof of prejudice was required, Beazley argues that it would still prevail because it was prejudiced by the Settlement Agreement. Beazley contends that it suffered prejudice when it was denied an opportunity to meaningfully participate in the settlement negotiations and Plaintiffs agreed to pay substantially more than they should have.

In response, Plaintiffs argue that: (1) Wis. Stat. § 631.11(4)(b) bars Beazley from denying coverage under its consent to settlement provision; (2) Beazley was not prejudiced by Plaintiffs' settlement; and (3) Beazley is estopped from disclaiming coverage based upon its consent to settle forfeiture provision. Relatedly, Plaintiffs argue that they had the right and duty to "act at all times as if uninsured" and to "take all reasonable action necessary or reasonably advisable to mitigate any Loss or potential Loss." Insurance Policy, Ex. A, at 11, ECF No. 2.

The parties also dispute whether New York or Wisconsin law should control the disposition of this provision. In an earlier order on this issue I declined to decide which states' law applied in this case because the parties had not yet shown that the choice of law would be outcome

14

determinative. Order Den. Mot. for Clarification 1, ECF No. 181. As noted above, the plain terms of the policy state that New York law controls. Insurance Policy, Ex. A, at 13, ECF No. 2. However, under either New York or Wisconsin law the result would be the same. *Vigilant Ins. Co. v. Bear Stearns Companies, Inc.*, 10 N.Y.3d 170, 178, 884 N.E.2d 1044, 1048 (2008) (holding that plaintiff cannot recover settlement proceeds when it did not follow consent to settlement provision of insurance policy); *Sch. Dist. of Shorewood v. Wausau Ins. Companies*, 170 Wis. 2d 347, 379, 488 N.W.2d 82, 94 (1992), *rejected in part on other grounds, Johnson Controls v. Employers Ins. of Wausau*, 264 Wis. 2d 60, 665 N.W.2d 257 (Wis. 2003) (same).

Even assuming prejudice is required, the same result follows. Beazley was unquestionably prejudiced by Plaintiffs' panicked settlement. The burden is on the plaintiffs-insured to show that an insurance company is not prejudiced. *Ranes v. Am. Family Mut. Ins. Co.*, 219 Wis. 2d 49, 52, 580 N.W.2d 197, 198 (1998). Other courts have noted the critical interest that insurance companies have in not being bound to cover settlements they did not consent to:

> It is pretty evident that if the insurer entrusted the matter of making settlements to its numerous policy holders, its existence would be precarious. We are all apt to be generous when it comes to spending the money of others. So long as the law countenances and to some extent encourages insurance of this character, the right of making voluntary settlements must, almost as a matter of necessity, rest with the insurer rather than with the insured. An insurance company could hardly be expected to do business on any other basis, because it furnishes the only safeguard available against the payment of excessive damages.

*Wisconsin Zinc Co. v. Fid. & Deposit Co. of Maryland*, 162 Wis. 39, 155 N.W. 1081, 1085 (1916). As the *Wisconsin Zinc* court wrote, forcing insurers to cover settlements after they are deprived of the opportunity to consent to or reject the settlement would give the insured the perverse ability to settle claims with the insurer's money. In some situations courts have even found that an insurer that

15

has been deprived of the ability to participate in settlement negotiations was prejudiced as a matter of law. *See Gerrard Realty v. Am. States Ins.*, 89 Wis. 2d 130, 145, 277 N.W.2d 863, 871 (Wis. 1979) ("As a result of the appellant's belated notice, the [insurer] was denied an opportunity to investigate, defend or settle the Millers' claim. Thus, we agree . . . that as a matter of law the [insurer] was prejudiced.").

Plaintiffs argue that Beazley cannot have been prejudiced because Beazley would have denied coverage even if it had been given sufficient notice. In support of this argument, Plaintiffs cite to *Fireman's Fund Ins. Co. v. Bradley Corp.*, 2003 WI 33, ¶ 63, 261 Wis. 2d 4, 40, 660 N.W.2d 666, for the proposition that "an insurer that admits it would have denied coverage even if it received timely notice is not prejudiced by a late notice as a matter of law." Pl.'s Reply Br. 2, ECF No. 225. But *Fireman's Fund* was a late-notice case, not a settle-without-consent case. *Fireman's Fund* also involved a Comprehensive General Liability (CGL) policy of insurance under which the insurer had a duty to defend as well as indemnify. The duty to defend under a CGL policy was broader than the duty to indemnify, extending to any claim that falls within the coverage of the policy, even if groundless, false, or fraudulent. *Id.* at ¶ 19. Moreover, under Wisconsin law, an insurer that breaches its duty to defend waives its right to control the defense of the claim and risks losing its right to deny coverage later. *Newhouse by Skow v. Citizens Security Mutual Ins. Co.*, 176 Wis.2d 824, 501 N.W.2d 1 (1993). Here, while Beazley was liable for costs of defending covered claims, it had no duty to defend Plaintiffs. More importantly, Beazley's defense is not merely that Plaintiffs' failed to provide timely notice of the claim, but that they settled the claim without Beazley's consent. *Fireman's Fund* did not discuss an insured's settlement without the insurer's consent and is thus inapposite to the case before the court.

Even if late notice was the only issue, *Fireman's Fund* would still not control. In *Fireman's Fund* the insurance company's litigation manager stated that if the insurance company had received timely notice of the claim it would not have handled the claim any differently. 2003 WI 33, ¶ 62, 261 Wis. 2d 4, 39, 660 N.W.2d 666, 683. Based on the insurer's statement that they would not have done anything differently, the court held that the insurer faced no prejudice. *Id.* at ¶ 62 (citing *Maryland Cas. Co. v. Wausau Chem. Corp.*, 809 F.Supp. 680, 695 (W.D.Wis. 1992) (holding as a matter of law there can be no prejudice "where there was evidence that insurers would *not have acted any differently* even if insured had given timely notice" (emphasis added))). Beazley does not admit—and Plaintiffs do not argue—that Beazley would not have done anything differently if given timely notice. Though Beazley states that it would have denied Plaintiffs' claim even had it been given timely notice, it also claims it would have done many other things differently. Therefore, neither the holding nor the reasoning of *Fireman's Fund* apply here.

Ultimately, the fact that a claim for coverage suffers from more than one defect does not mean that an insurer can't be prejudiced by late notice. *See Neff v. Pierzina*, 2001 WI 95, 245 Wis. 2d 285, 629 N.W.2d 177; *Guar. Bank v. Chubb Corp.*, 538 F.3d 587, 591 (7th Cir. 2008). Here, given Plaintiffs' argument that some portion of Loss was covered, Beazley was deprived of an opportunity to clarify its potential exposure. By the time Beazley was notified of the Third Party Claim, the Plaintiffs and buyer had already agreed to the "overall economic terms" of the settlement. Stephen Kravit Dep. 65:17–66:25, ECF No. 187-3. Additionally, by Plaintiffs' own words, the settlement was induced by Plaintiffs' fear of potential criminal exposure, including jail—possibilities Beazley had no duty to defend against or pay to avoid. Daniel Ratajczak Dep. 216:21–23; 217:3–4; 230:10–11, ECF No. 187-9; Insurance Policy, Ex. A, at 5, ECF No. 2 ("Loss shall not include . . .

17

criminal fines or penalties."). Beazley was also denied the opportunity to attempt to lower the settlement amount and structure the settlement to protect its interests. The ability to structure the settlement differently would clearly have been beneficial to Beazley, given that then Beazley could have sought to clearly apportion settlement amounts between covered and uncovered claims—a measure which would have largely eliminated the need for this suit.

Plaintiffs argue that Wis. Stat. § 631.11(4)(b) bars Beazley from disclaiming coverage under the Policy's consent to settlement provision. Wis. Stat. § 631.11(4)(b) provides:

> If after issuance of an insurance policy an insurer acquires knowledge of sufficient facts to constitute grounds for rescission of the policy under this section or *a general defense to all claims under the policy*, the insurer may not rescind the policy and the defense is not available unless the insurer notifies the insured within 60 days after acquiring such knowledge of its intention to either rescind the policy or defend against a claim if one should arise.

(emphasis added). Beazley waited over 60 days before informing Plaintiffs that one of the bases it was declining coverage for was a lack of consent to settlement. But Wis. Stat. § 631.11(4)(b) does not apply here. Beazley does not raise the consent to settlement provision to rescind the policy or as a general defense to all claims under the policy; Beazley raises the consent to settlement provision as a defense to coverage of this particular claim over this particular settlement. *Estate of Logan v. Northwestern Nat'l Cas.*, 144 Wis. 2d 318, 346, 424 N.W.2d 179 (Wis. 1988), held that "Section 631.11(4) does not require notice if the insurer acquires knowledge sufficient to constitute a defense to *a particular claim* under the policy while acknowledging that other claims remain covered by the policy." (emphasis added). Here Beazley acknowledges (correctly) that other claims remain covered under the Policy—this claim is simply not one of them.

18

Plaintiffs also argue that Beazley is estopped from relying on the consent to settlement provision to deny coverage. Specifically, Plaintiffs contend that Beazley induced them into a course of action detrimental to coverage by remaining silent during the critical December 24–28 time frame. Plaintiffs' estoppel by silence argument fails for a number of reasons. To begin, Plaintiffs bear the burden of establishing that estoppel is appropriate here. *Badger Scaffold v. Hartford Underwriters*, 2003 WI App 42, ¶ 9, 260 Wis. 2d 602, 658 N.W.2d 88 (table). As Plaintiffs correctly note, the doctrine of estoppel by silence requires: "a right and an opportunity to speak and an obligation or duty to do so." *Mortgage Assocs., Inc. v. Momona Shores, Inc.*, 47 Wis. 2d 171, 185, 177 N.W.2d 340 (1970). Beazley had no obligation to affirmatively consent or refuse to consent to the settlement here. Rather, the Policy required Plaintiffs to determine whether Beazley wanted to participate in settlement negotiations and required Plaintiffs to seek Beazley's consent prior to settling. In short, the Policy placed the responsibility for reaching out on Plaintiffs. And unlike the insurers in the cases cited by Plaintiffs, Beazley did not have a "duty to defend" triggering affirmative responsibilities to act. *See Towne Realty, Inc. v. Zurich Ins. Co.*, 201 Wis. 2d 260, 268, 548 N.W.2d 64, 67 (1996); *Bradley Corp. v. Zurich Ins. Co.*, 984 F. Supp. 1193, 1199 (E.D. Wis. 1997). Plaintiffs had a duty to comply with the terms of the Policy, and no special circumstance existed here that would have placed an obligation on Beazley to remind Plaintiffs of their obligation. "[I]t is apparent that something more than the standard insured-insurer relationship is required in order to create a special relationship obligating the insurer to advise the policyholder concerning . . . insurance coverage." *Nelson v. Davidson*, 155 Wis. 2d 674, 683, 456 N.W.2d 343 (Wis. 1990). Therefore, Beazley is not estopped from relying on the consent to settlement provision to deny coverage.

19

Finally, Plaintiffs' general duty to act as if uninsured and mitigate damage from loss did not excuse them from complying with the specific terms of the Policy. Although it is theoretically possible that the mitigation of loss provision could function as an excuse not to obtain written consent for a settlement, that is not what happened here. Beazley does not dispute that Plaintiffs may have lowered the total loss amount by settling by year end and striking a better deal with the buyers. Nevertheless, there are key facts that preclude Plaintiffs from relying on the rushed nature of the negotiations to excuse nonperformance of the Policy. To start, Plaintiffs knew of the buyer's claims for weeks before contacting Beazley, and essentially resolved the overall settlement terms thirteen days before contacting its insurer. The Policy required Plaintiffs to deliver notice of a third party demand to the Beazley *as soon as reasonably practicable* after Plaintiffs became aware of the third party demand. Insurance Policy, Ex. A, at 8, ECF No. 2. The December 24 notice here was more like an afterthought. Additionally, Plaintiffs never asked Beazley for consent to the settlement—something Plaintiffs were required to obtain before settling. *Id.* at 10. Beazley, as noted above, had no affirmative duty to reach out and demand that Plaintiffs only settle with Beazley's approval. Plaintiffs also did not provide Beazley with all of the settlement negotiation papers prior to the settlement being finalized—in violation of a separate provision of the Policy. *Id.* Given these circumstances, I find that the Policy's provisions requiring Plaintiffs to act as an uninsured and mitigate losses did not excuse Plaintiffs' duty to obtain Beazley's written consent prior to entering a settlement agreement. Plaintiffs cannot use expediency as an excuse for failing to obtain consent after delaying weeks before contacting their insurer. For the same reason, I also find that Beazley did not unreasonably withhold, delay, or condition their consent.

20

Therefore, I find that Beazley is entitled to summary judgment because Plaintiffs settled the third party claim without first obtaining Defendant's written consent.

## CONCLUSION

Because I conclude that summary judgment should be granted in full for the defendant, I will not discuss Defendant's alternative arguments for partial summary judgment or Plaintiffs' arguments for partial summary judgment. Based upon the foregoing analysis Defendant's motion for summary judgment (ECF No. 186) is **GRANTED** and Plaintiffs' motion for partial summary judgment (ECF No. 188) is **DENIED**.

The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this  17th  day of August, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court